UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
DAVID L. WHITEHEAD,            )
                               )
          Plaintiff,           )
                               )
     v.                        )  Civil Action No. 01-1192 (RWR)
                               )
CBS/VIACOM, INC., et al.,      )
                               )
          Defendants.          )
_____)
```

MEMORANDUM OPINION

Plaintiff David L. Whitehead brought this action against
defendant CBS/Viacom and others for allegedly infringing his
original copyrighted works in writing the 2000 screenplay and in
producing the 2001 CBS miniseries, "Blonde."  Defendant
CBS/Viacom moves for summary judgment on the remaining counts in
the amended complaint[1] alleging copyright infringement and unfair
competition in violation of the Copyright Act, 17 U.S.C. §§ 101
*et seq.* (2000), and the Lanham Act, 15 U.S.C. § 1125(a).  Because
no reasonable jury could find substantial similarity between the
protectable elements of plaintiff's plays and defendant's work,
defendant's motion for summary judgment will be granted.

---

[1]     Other counts were dismissed earlier, see Mem. Op. at 11
(March 28, 2002), and CBS/Viacom is the sole remaining defendant.

- 2 -

<u>BACKGROUND</u>

_____Plaintiff contends that defendant's "Blonde" is "strikingly

similar" to his short plays "Marilyn Dances:  Happy Birthday

Mr. President" and "My Aretha."  (Am. Compl. at ¶ 10.)  Plaintiff

specifically points to the "characterization, phrases, lines,

sequences of events, expression of ideas, mood, interplay between

characters and dialogue," in addition to the central theme with

"easily identifiable characters," allegedly shared between

defendant's work and plaintiff's copyrighted plays.  (<u>Id.</u>)

According to plaintiff, "defendant's work retells the original

work of Mr. Whitehead in an elongated version from the same

perspective of the main character, Marilyn Monroe.  In essence,

defendants merely encapsulate the same story while adding new

twists."  (Pl.'s Resp. at 21.)  While plaintiff lists 25 alleged

similarities between "Marilyn Dances:  Happy Birthday

Mr. President" and "Blonde" (Pl.'s Resp. to Def.'s Mot. for Summ.

J. ("Pl.'s Resp.") at 12, Ex. B ("Whitehead Aff.") at 3-8), he

makes only passing reference to the similarity between "My

Aretha" and the defendant's work.  ("Whitehead Aff." at ¶ 24.)

In the motion for summary judgment, defendant claims that there

is no substantial similarity between plaintiff's plays and

defendant's screenplay and that the only commonality among the

works is the "wholly unprotectable use of American film icon

- 3 -

Marilyn Monroe . . . and a few equally unprotectable historical references appurtenant."  (Def.'s Mot. for Summ. J. at 1.)

I.   MARILYN DANCES:   HAPPY BIRTHDAY MR. PRESIDENT

Plaintiff's short play features lead character Marilyn Monroe as she travels from Los Angeles to Rome to New York.  It begins with a dedication to Monroe and dance scenes featuring music by the artist Prince.  (Am. Compl., Ex. C. at 1.)  In the first scene, Monroe enters wearing a red dress and speaks to the audience, telling everyone "I'm back" and that she has just received an invitation from President Kennedy to sing for his 45th birthday party.  She announces as her special guest Elizabeth Taylor who then greets Monroe and engages her in conversation about Monroe's experiences in heaven.  It is at this moment that the reader realizes that Monroe's appearance is posthumous -- she is going back into time to revisit her life's events.  (Id. at 2.)  The two engage in comical banter and Monroe exits as Taylor describes the world's events since Monroe's death, particularly the phenomenon of Michael Jackson.  Monroe reenters the scene to travel with Taylor to Rome to visit Taylor's love interest, Richard.  Director Cukor enters and orders Monroe to finish shooting a film.  (Id. at 3.)  The conversations are short.

- 4 -

Scene Two begins after Monroe and Taylor arrive on the set of "Cleopatra" in Rome as Taylor and Richard exchange loving vows.  Monroe claims that she is bored and leaves in a huff to go back to Los Angeles.  (<u>Id.</u> at 4-5.)  In the next scene, Monroe and character Henry Weinstein continue the characteristic light-hearted dialogue by discussing fashion, bodies, and hair before Weinstein leaves to allow Monroe time to speak with a reporter from the "LA Sun."  The reporter eagerly asks Monroe to describe her life story and Monroe obliges after asking him "[d]o you have any pills?"  (<u>Id.</u> at 7.)  Monroe starts to talk in rap genre about her life as Norma Jeane and describes how her mother told her that she "was only a dream, and not the real thing."  Monroe continues the soliloquy by describing her transformation from "Norma Jeane" into the movie star and her struggles to be accepted as an artist and as "perfect."  She laments that she is sometimes "on the verge of craziness" and that she finds herself "doing an imitation" of herself.  (<u>Id.</u> at 8.)  Adding to the sophomoric atmosphere, the reporter wiggles his tongue at Monroe. When Monroe finishes her rap, the reporter begs that she answer one more question about her undergarments and her future goals. The two end the scene dancing to more music by Prince.  (<u>Id.</u>)

In the half-page text comprising Scene Four, Joe, the "dumb baseball player," and Arthur, "the playwright," fight over the

- 5 -

affections of Monroe.  Arthur vows that Monroe will marry him
because he is "her true love" and has the intellectual edge.
Monroe tells the two to stop fighting and that she is off to New
York.  Joe tells Monroe that she should forget about singing for
JFK and that she is too fat to wear the dress.  Arthur begs
Monroe to stay and she fancifully exits yelling "Natasha."  (Id.
at 9.)

Scene Five features Monroe and Director Cukor arguing over
her trip to New York City.  Jean, the seamstress, enters to tell
Cukor about the dress that he designed for Monroe and goes into
an extended discussion of the beading, fit, and design of the
dress with his assistant Marge.  Jean asks Monroe to try on the
dress before leaving and Monroe emerges to pose for the camera as
music by Prince accompanies her movements.  (Id. at 10-13.)
Scene Six shows Monroe talking to the President on the phone and
then proclaiming that she "[is] the luckiest girl" and that
"Jackie [is] out."  She states that she is nervous about going to
NYC and asks "[s]omeone give me some pills" as a pilot salutes
and she leaves.

After the intermission, Scene Seven begins with Marilyn
singing "Happy Birthday" to the President.  President Kennedy,
looking over his shoulder, admires Monroe, musing "[w]hat an ass,
Gene, what an ass."  He then thanks the audience for attending

- 6 -

and particularly thanks Monroe for singing.  (<u>Id.</u> at 14.)  He
tells Bobby and Monroe to meet backstage where they take pictures
and discuss the President's ability to dance.  (<u>Id.</u> at 14-15.)

Scene Eight is entitled "Sexy MF" and showcases a dance by
Monroe and President Kennedy to Prince's "Adore."  In Scene Nine,
Jackie asks Kennedy to tell Monroe to stop calling the White
House, and the two lightly argue over undergarments found in
Kennedy's bed.  Kennedy claims that "J. Edgar" may have planted
them to destroy the marriage.  After Jackie tells Kennedy that
she loves him, she takes a phone call from Monroe and tells her
to leave Kennedy alone.  (<u>Id.</u> at 16-17.)  Next, Bobby is seen
consoling an upset Monroe in Scene Ten and the two dance to music
by Prince.

In Scene Eleven, the audience is introduced to
Dr. Greenspan, Monroe's psychoanalyst.  He tells the audience
about his credentials and his belief in drug therapy.  He
describes Monroe as a person in need of love and calls himself
"Dr. Feelgood" as he gives Marilyn some pills.  (<u>Id.</u> at 18.)
Scene Twelve shows Bobby and Monroe as Monroe begs him not to
leave.  In Scene Thirteen, titled "Thieves in the Temple," Taylor
reappears and tells the audience that she is confused about her
relationship with Richard.  As the lights go out, Dr. Greenspan
is heard on the phone with an operator asking for police to deal

- 7 -

with Monroe's suicide.  (<u>Id.</u> at 20.)  The police arrive on the

scene and declare that Monroe's was "the most obviously staged

death scene."  (<u>Id.</u> at 21.)  The scene ends with the police

sergeant declaring that "Marilyn Monroe didn't commit suicide,

she was murdered."  The last scene shows a reporter lamenting

Monroe's death and ends with Taylor seeking Monroe as lights fade

with Prince's "When Doves Cry" providing the musical finale.

II.  MY ARETHA

       According to plaintiff, the offending portions of "Blonde"

incorporate dialogue from "My Aretha" in which a Young Aretha

fears the loss of her father.  (Whitehead Aff. at ¶ 24.)  In the

opening scene, Aretha grabs her father's pant leg and tells him

"Daddy, daddy, you know that I love you so much."  She implores

him to "[p]romise me, daddy; don't leave me" and her father

assures Aretha that he will never leave.  The ensuing scenes show

an adult Aretha singing with a church choir and watching her

father deliver a sermon to his congregation.  The penultimate

scene shows a Young Aretha searching for her father.  The nine

page play ends with Aretha singing.

III. BLONDE

       Defendant's screenplay, as adapted by Joyce Eliason for

television from Joyce Carol Oates's book <u>Blonde</u>, chronicles the

trials and tribulations of Marilyn Monroe's career and personal

- 8 -

development.  The 183-page script was used to film a four-hour,
two-part miniseries which took "an intimate approach to [Marilyn
Monroe], explaining her genesis as an actress, her insecurities
and neuroses, and her failed love affairs and marriages through a
virtual psychoanalysis of Marilyn, complete with periodic
intimate revelations of the inner thoughts of Marilyn and the
other characters, told straight to the camera as if it (or the
audience) were the therapist."  (Def.'s Mot. for Summ. J. at 10.)
The play begins with a vision of Monroe singing "I wanna be loved
by you" and cuts to Monroe lying on the sand, hallucinating about
her past.  It was a "dream.  A memory."  Joyce Eliason, "Blonde"
1-2 (2000).  The scene fades to "Norma Jeane" -- Marilyn Monroe
pre-fame -- stating that her "mother wasn't [at the hospital]"
where she was born.  "Where [her] mother was . . . no one knew."
Id. at 2.

    The audience is then taken forward to 1934 where Norma Jeane
and her "Grandma Della" are seen feeding sea gulls on the beach.
Norma Jeane is content with her grandmother as the two run along
the sand.  In the next sequence, Norma Jeane's mother shows a
flustered Norma Jeane a picture of her father and tells her that
"someday he will return to Los Angeles to claim you . . . ..  He
has promised . . . .."  Id. at 8.  Later, we see a young Norma

Jeane under the covers of her bed, staring at the picture of her father and whispering "Dad-dy." Id. at 10.

One of the first tragic scenes shows Norma Jeane bursting in the door of Grandma Della's home to find her hunched over the toilet and bathtub.  Norma Jeane cries out, believing that her grandmother's death was her fault for playing outside.  Id. at 11-11A.  Subsequently, the audience sees the unstable psychosis of Norma Jeane's mother as she discusses Grandma Della's death and as she directs Norma Jeane to re-stage a movie about a Fair Princess and Dark Prince.  Id. at 14.  The young girl is subject to the mother's mental instability and the audience is shown the effect the mother's actions have on the young Norma Jeane.  The audience is also quickly made aware of Norma Jeane's allure to men.  Norma Jeane's early piano lessons show that even the middle aged teacher is smitten with the young girl, and he sticks his tongue into giddy young Norma Jeane's ear.  Id. at 16.  Later, because Norma Jeane has mistaken the teacher's action as innocent play, she asks him to tickle her with his tongue again, to the disapproval of her mother.  Id. at 18.

Norma Jeane's struggles with her identity, particularly her anxiety about her father, are underscored in the next scene in which her frantic and obviously disturbed mother heads toward a burning hill to see Norma Jeane's father.  The young girl is

taken aback, and wonders "w-was he here?  Father?  All this time?
Why didn't he come and see us?"  Id. at 20.  Norma Jeane's mother
tells her that Norma Jeane is "the reason your father went away.
He didn't want you" as she frenetically tries to "cleanse" Norma
Jeane in a psychotic fit.  Id. at 23.  Soon, Norma Jeane's mother
is institutionalized.  Id. at 24.  The scene dramatically
foreshadows the role of mental anguish and illness for Monroe.

     After Norma Jeane is put into an orphanage, the audience
sees her natural abilities in front of the camera, even as she is
a young child.  She "catches her image in the parabolic reflector
of a flash camera.  Her magic friend.  Suddenly she smiles" and
flashbulbs continue to flash.  Id. at 28.  Norma Jeane is
intrigued by her own reflection later at the orphanage and this
"magic friend" becomes her confidant as Norma Jeane endures the
pains of living at the orphanage with an institutionalized mother
and no prospect of being adopted.  Id. at 33.

     The scene then moves chronologically forward to 1941 as
Norma Jeane develops in her teen years with the Pirig family.
The audience is taken through her first play audition, which was
unsuccessful.  A weeping Norma Jean is comforted by her teacher,
Mr. Haring, who tells her that she is a poet -- not an actor or
cheerleader.  Id. at 39.  Norma Jeane accepts the compliment

- 11 -

easily and declares that she has "lots more [poems]" and that she loves poetry.  <u>Id.</u>

The script then delves into Norma Jeane's first marriage, at the behest of her foster mother, to Bucky Glazer.  <u>Id.</u> at 40-50. In an exchange, it is clear that Norma Jeane treats her new husband as a source of stability and love and she calls Bucky "Daddy."  <u>Id.</u> at 53-55.  After Bucky tells Norma Jeane that he has enlisted in the merchant marine, she begs him "Please, Daddy! You can't leave me.  I'll die if you leave me."  <u>Id.</u> at 59. Norma Jeane is intent on getting pregnant to stifle the loneliness she will face once Bucky is overseas.  Bucky refuses and Norma Jeane attempts to commit suicide by slitting her wrist. <u>Id.</u> at 60.

Act Five begins with Norma Jeane talking to the camera, telling the audience that she was free with Bucky gone -- without a tie to an orphanage, and no longer constrained as a foster child, daughter-in-law, or wife.  <u>Id.</u> at 62.  In order to earn money, she takes on a job and agrees to take photographs for a magazine.  The scene cuts to Bucky overseas, angry that she "wasn't wearing a brassiere.  Probably no underpants either." <u>Id.</u> at 65.  Next, Norma's career onscreen begins as the scene ends with a casting call with her first director.  <u>Id.</u> at 71. The director gives her the new name of Marilyn Monroe.  <u>Id.</u> at

74. Monroe speaks to the audience again, revealing that she "saw
that [she] must be sold.  For then, [she] would be desired, and
[she] would be loved."  Id. at 76.  This confessional highlights
Monroe's motivations for acceptance and love, a theme prevalent
in the play.

The next act begins with Monroe rehearsing for the movie
"Asphalt Jungle" and, as she finishes her scene, the Director
tells his assistant "Sweet Mary.  Look at the ass on that little
girl, will you?"  Id. at 83.  The next few scenes reveal Monroe's
relationship with Cass Chaplin and her rise to stardom.  The
action moves from the movie premiere to Monroe's discovery that
Cass Chaplin has been having a relationship with "Eddy G." and
another woman.  Monroe attempts to swallow an entire bottle of
pills and is soon comforted by Isaac Shinn who proposes marriage.
Monroe despondently rejects his advances, id. at 97, and is next
seen at another audition where a director takes advantage of
Monroe.  Id. at 98.  Monroe talks to the camera afterwards
stating that she was afraid to resist for fear of not being
"loved . . . or wanted . . . or given a chance."  Id. at 98.  As
Monroe's rehearsal and filming scenes are shown, it is clear that
her conviction to be "perfect" drives her to lose herself in the
scenes.  Her pain and sadness are readily evident.  She has
numerous exchanges with the director about her ideas and

- 13 -

suggestions, which are summarily dismissed by the Director as "too intense."  Id. at 102.

The screenplay weaves from Monroe's acting jobs, her visits with her sick mother, and problems from the publicity of her pre-fame photos.  The director tells the audience that he "couldn't get rid of her because [he] was afraid she would be hired by a competitor . . ..  We couldn't invent another blonde . . . one that could make so much money . . . so cheap."  Id. at 107.

Monroe is constantly exploited for her sexuality and one scene depicts a movie investor wondering whether his money gets him a "boogie with the star."  Monroe does not know how to react and the audience is impressed with the helplessness of Monroe.  Later, the story takes the audience to Monroe's first meeting with the "Ex-Athlete," Joe DiMaggio and their married life together.  Id. at 132-138, 143-147.  Desperately seeking another father figure, Monroe calls the ex-athlete "Daddy" as well.

At another audition, Monroe meets the "playwright," Arthur Miller, and they begin an affair that ends in marriage and then divorce.  Id. at 143-157.  The audience is taken also to the set of the "Prince and the Showgirl," where Monroe argues with her co-star, Lawrence Olivier.  Id. at 158.  Next, Monroe is seen collapsing on the set.  Id. at 162.  Miller takes her away to the

- 14 -

countryside and the two live a relatively banal life for a few weeks.  Monroe calls Miller "Daddy."  <u>Id.</u> at 172.

In the final scenes, Monroe is seen on stage, singing "Happy Birthday" for President Kennedy.  As she sings, the credits run stating that "Marilyn Monroe was one of the biggest stars of the Twentieth Century.  An icon.  Loved and adored throughout the world.  She died at age thirty-six under mysterious circumstances.  She was never a mother."  <u>Id.</u> at 183.

<u>DISCUSSION</u>

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; <u>see also</u> <u>Celotex v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law," giving the non-moving party the benefit of reasonable inferences drawn from the facts.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-250 (1986); <u>see also</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).[2]

---

[2]    At the time defendant filed its motion, Local Civil Rule 7.1(h) required the moving party to submit a "statement of material facts as to which the moving party contends there is no genuine issue . . . ."  LCvR 7.1(h) (now amended as LCvR 7(h)).

- 15 -

I.   COPYRIGHT INFRINGEMENT, 17 U.S.C. § 101 *et seq*.

     To prove infringement under the Copyright Act, 17 U.S.C.

§ 101 *et seq*., plaintiff must prove 1) ownership of a valid

copyright[3] and 2) copying of protected elements of his

copyrighted works.  See Feist Publications, Inc. v. Rural Tele.

Serv. Co., Inc., 499 U.S. 340, 361 (1991); 17 U.S.C. § 501

("Anyone who violates any of the exclusive rights of the

copyright owner . . . is an infringer of the copyright . . ..").

Without direct evidence of copying, plaintiff "can raise the

inference of copying by demonstrating that the alleged infringer

had access to the protected work and that the works are

---

Although defendant failed to provide the statement, copyright
infringement claims require the court to look at the "actual
texts [as] the relevant evidence.  Comparison of secondary or
descriptive materials cannot prove substantial similarity."
Nelson, 942 F. Supp. at 652-53.  As such, defendant's failure
here will not preclude a ruling on the motion for summary
judgment.

     [3]   Section 410 of the Copyright Act provides that the
"certificate of a registration made before or within five years
after the first publication of the work shall constitute prima
facie evidence of the validity of the copyright and of the facts
stated in the certificate.  The evidentiary weight to be accorded
the certificate of registration made thereafter shall be within
the discretion of the court."  17 U.S.C. § 410.  Plaintiff has
provided a certificate of registration from 1998 for both his
plays at issue here.  (Am. Compl., Ex. C. at 1 (showing
registration number TX-2-285-997).)  Defendant concedes for the
purposes of the case that plaintiff has a valid copyright.
(Def.'s Reply at 2.)  Plaintiff has established that he owns a
valid copyright and must prove only copying to prevail in his
copyright infringement claim.

substantially similar." Nelson v. Grisham, 942 F. Supp. 649, 651
(D.D.C. 1996). Substantial similarity in turn rests on whether
the average "lay observer would recognize the alleged copy as
having been appropriated from the copyrighted work." Atkins v.
Fischer, 331 F.3d 988, 993 (D.C. Cir. 2003) (quoting Hamil Am.,
Inc. v. GFI, 193 F.3d 92, 100 (2d Cir. 1999)). When comparing
works, the test for similarity rests on the "total concept and
feel" of the works, notwithstanding any differences between the
copyrighted and allegedly infringing work. Atkins, 331 F.3d at
993-94; see Nelson, 942 F. Supp. at 653 (explaining that two
works cannot be considered similar "when the total perception of
all the ideas as expressed in each character is fundamentally
different") (internal citations omitted). Copying a shorter work
and integrating it into a longer work is not permissible under
the Act. See Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d
610, 624 n.14 (2d Cir. 1982) (describing "fragmented literal
similarity," or copying verbatim portions of a work into
another).

The focus of the substantial similarity inquiry is on the
"expression of an idea or fact, not on the similarity of the
facts, ideas, or concepts themselves." Nelson, 942 F. Supp. at
652 (quoting Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992)).
This is because only original expression is protected, not facts.

- 17 -

See 17 U.S.C. § 102(b) (stating that facts are not original and therefore not protected by the Copyright Act).  "The *sine qua non* of copyright is originality," which "limits severely" the protected scope of works.  Feist Publications, Inc., 499 U.S. at 345.  Similarly, sequences of events necessary to certain contexts, known as scenes a faire, see Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d 38, 46 (D.D.C. 1999), stock themes, and settings are unprotected.  See Walker v. Time Life Films, Inc., 784 F.2d 44, 50 (2d Cir. 1986).  Descriptions of settings that "are too general to be deserving of copyright protection" are likewise irrelevant to determining infringement. Hoehling v. Universal City Studios, 618 F.2d 972, 979 (2d Cir. 1980).

Even though questions of substantial similarity for copyright claims have been cast as "extremely close question[s] of fact," Atkins, 331 F.3d at 993, summary judgment is proper if evidence of substantial similarity is "merely colorable" or "not significantly probative." Anderson, 477 U.S. at 249-50; see also Whitehead, 53 F. Supp. 2d at 38 (granting summary judgment on issue of substantial similarity in copyright infringement claim), aff'd per curiam, No. 99-7137, 2000 WL 33363291 (D.C. Cir. April 19, 2000), cert. denied, 531 U.S. 1033 (2000); Nelson, 942

F. Supp. at 649 (granting defendant summary judgment for lack of substantial similarity).

A.   <u>Total Concept and Feel</u>

Taken as a whole, plaintiff's plays and "Blonde" are very different in total concept and feel.  While "Marilyn Dances: Happy Birthday Mr. President" is a whimsical play that evokes the genres of farce[4] and theater of the absurd,[5] "Blonde" is a drama without any of the fantastic qualities of plaintiff's plays. "Marilyn Dances:  Happy Birthday Mr. President" contains scenes in which Marilyn Monroe flits in and out, engaging the other characters in often silly, humorous, and capricious dialogue. The audience quickly is made aware that the play requires a suspension of literal belief for Monroe comes back from the dead to chit-chat with her special guest, Elizabeth Taylor.  Monroe comically relates her conversations with God in heaven and soon

---

[4]     A farce is defined as a "light dramatic work in which highly improbable plot situations, exaggerated characters, and often slapstick elements are used for humorous effect."  <u>American Heritage Dictionary of the English Language</u> (Houghton Mifflin Co., 4th ed. 2000).

[5]     The "images of the theater of the absurd tend to assume the quality of fantasy, dream, and nightmare; they do not so much portray the outward appearance of reality as the playwright's emotional perception of an inner reality."  Martin Esslin, <u>The Theatre of the Absurd</u> (Grolier Electronic Publishing 1995).

- 19 -

makes pop culture references to rappers and other musical
artists.   Monroe of plaintiff's play moves to and from Rome, Los
Angeles, and New York, traveling back and forth in time.
Characters enter and exit quickly, offering disjointed topics of
conversation and amusing banter.   The interludes featuring music
by Prince and dance troupes add to the light-hearted and
whimsical feel of the play.   The pace is fast and the sequence of
events non-linear.   The focus is not so much on Monroe's life as
it is on the dynamic of the improbable conversations.   The
setting of the play is where time and place are flexible; the
entire play seemingly takes place in a day in Los Angeles, on the
Egyptian set of "Cleopatra," and New York.

By contrast, defendant's work is a drama that
chronologically tracks Monroe's life.   The mirthful concept and
feel of plaintiff's play is entirely absent in "Blonde,"
substituted instead with a rather dark and somber perspective of
Monroe's experiences.   The drama prominently features a motif of
psychosis, with Monroe's mother depicted as mentally ill and
Monroe herself struggling with self-doubt and constant anxiety.
The drama is relatively straightforward and realistic, with few
elements of humor or fantasy.   "Blonde" is presented as a
biography would be, focusing on the events of Monroe's life.   The
purpose is not to convey humor, but to show substantively

- 20 -

Monroe's rise in Hollywood and fame.  The screenplay's time line journeys through more than two decades of Monroe's life without skipping from moment to moment.  The serious concept and feel of the drama is further underscored by the confessional scenes in which characters speak directly into the camera to reveal personal insights and thoughts about Monroe.  Read in juxtaposition, no reasonable trier of fact could find that the dark "Blonde" and the light-hearted "Marilyn Dances:  Happy Birthday Mr. President" are substantially similar.

    B.   Allegedly Infringing Elements

    Despite the lack of substantial similarity in total concept and feel, plaintiff lists, in tabular form and by affidavit, individual elements of "Blonde" that evidently show striking similarities to his plays.  Such charts generally are not useful given that the examples "appear to be taken out of context" and artificially segregate elements that serve different purposes in the works as a whole.  Nelson, 942 F. Supp. at 652.  However, even assuming that a piece-meal analysis is helpful to determine whether works are substantially similar, analyzing the allegedly offending portions here shows that plaintiff cannot support a copyright infringement claim.[6]  Plaintiff's allegations distill

_____

    [6]    Plaintiff provides declarations of three proffered experts to buttress his claim that the works are substantially

down to three broad categories of unprotectable elements:   style,

facts, and purportedly similar expression that is not similar.

> 1.   Writing Style

Plaintiff claims that defendant copies his use of

"posthumous narration," "writing style weaving fiction to truth,"

and "fictional script/novel."   (Pl's Resp. to Def.'s Mot. for

Summ. J. at 12.)   The claim that both works share a "posthumous

narration" is wholly meritless.   "Blonde" chronologically follows

Monroe's life; she does not come back from the dead as she does

in plaintiff's play to tell her story.   "Blonde" and plaintiff's

plays may both indeed weave fiction and truth, but even if that

---

similar.  (Pl.'s Opp'n at 17 (stating that plaintiff's claim
"relies in part on several expert affidavits")).)  "[E]xpert
testimony is not relevant . . . when the question of substantial
similarity depends on the observations of the ordinary reasonable
person."  Nelson, 942 F. Supp. at 653.  Even so, the declarations
amount to unsupported, conclusory statements that the works
contain "striking," "stark," or "marked" similarities.  (Pl.'s
Opp'n at Ex. C (Decl. of Prof. Kelsey E. Collie), D (Decl. of
Samuel F. Yette), E (Decl. of Dr. Elaine B. Todd).)  "[I]n any
case involving substantial similarity, the actual texts are the
relevant evidence."  Nelson, 942 F. Supp. at 653 (rejecting an
expert's declaration that two works were substantially similar
and granting the defendant's motion for summary judgment); see
also Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1179-80 (9th
Cir. 2003) (noting court's discretion to reject expert testimony
and grant summary judgment in copyright infringement action in
which the court found the two works similar only on an
unprotected level of abstraction and where the expert's testimony
"merely restated" the plaintiff's allegations).  Without any
perceptible similarity between the protectable expression of
plaintiff's and defendant's works, no genuine issue of fact
exists.

shows a common style, style alone cannot support a copyright

claim.  While similar writing styles may contribute to similarity

between works' total concept and feel, a particular writing style

or method of expression standing alone is not protected by the

Copyright Act.  See Feist Publications, Inc., 499 U.S. at 350,

362 (explaining the idea/expression dichotomy and how an

alphabetical system of organization did not fall within the

copyright act's scope of "originality").  Analyzed both in

isolation, and in concert with all the other constituent elements

of the works, the writing styles here do not render the works

substantially similar.

>        2.    Facts

Facts are never original and no one may claim copyright

protection for facts.  17 U.S.C. § 102(b); see Feist

Publications, Inc., 499 U.S. at 347.  "Copying bare historical

facts" is not prohibited.  Feist Publications, Inc., 499 U.S. at

348 (citing Harper & Row, Publishers, Inc. v. Nation Enterprises,

471 U.S. 539, 556-57 (1985)).

A number of plaintiff's claims rely on facts that appear in

both his and defendant's works.  Historical facts about Marilyn

Monroe's life are not subject to copyright.  For example, it is

without dispute that Monroe was a Hollywood film icon who many

believed died prematurely, that she had been married to an "Ex-

- 23 -

Athlete" and a "Playwright," namely, Joe DiMaggio and Arthur
Miller, that she had a strained relationship with her mother,
that Monroe wrote poetry, and that Monroe was prescribed pills by
a psychiatrist.[7]   Plaintiff takes issue with defendant's use of
each of those facts.   (Whitehead Aff. at ¶¶ 20, 21, 22, 26, 28,
30, 32, 43.)   It is ironic that plaintiff claims infringement
based on facts that are detailed in the various sources he cites
in his own bibliography:   Grandmother Della dies early; Monroe
describes her marriage to an ex-athlete, Joe DiMaggio, and a
playwright, Miller; and Elizabeth Taylor -- the special guest in
plaintiff's play -- is featured prominently in both book sources.
See Daniel Spoto, Marilyn Monroe 2 (describing grandmother
Della's death), 202-10 (marriage to DiMaggio, the "ex-athlete"),
268 (Monroe intends to marry Arthur Miller, "her favorite
playwright), 472-73 (Elizabeth Taylor) (Harper Collins 1993);
Peter Harry Brown & Patte B. Barham, Marilyn, The Last Take 6,

---

[7]     Plaintiff lists three sources for his play -- two books
and a magazine article.  Both books posit that Monroe died
tragically and before her time and support the other facts
listed.   See Peter Harry Brown & Patte B. Barham, Marilyn, The
Last Take 2 (Dutton Books 1992); Daniel Spoto, Marilyn Monroe 1
(Harper Collins 1993).

12, 30, 81, 182-189, 222, 232, 364-68 (Elizabeth Taylor) (Dutton

Books 1992).[8]  Those life events are unprotectable facts.

Plaintiff also attacks phrases in "Blonde" that describe

facts from Monroe's life.  "Subjective descriptions and

portraits" of facts are "expressive" and protected under the Act,

Harper & Row, 471 U.S. at 349, though the "isolated use of a word

or phrase . . . is not copyrightable." Whitehead, 53 F. Supp. 2d

at 48 n.5.  Plaintiff claims that "Blonde" directly lifts his use

of the term "daddy" in "My Aretha" when Monroe calls her

boyfriends and husbands "Daddy."  Even if it were not fact that

Monroe called her husbands "Daddy," as is established in Spoto,

Marilyn Monroe 81 ("[Monroe] called me daddy"), the use of the

term daddy in "My Aretha" and "Blonde" serve distinct purposes

and reasonably cannot be considered similar.[9]  An adult Monroe's

---

[8]     Many of plaintiff's characters and elements are also
described in his sources.  For example, Richard Burton and
Elizabeth Taylor's affair and the set of "Cleopatra" are
extensively described in Brown & Barham.  Marilyn, The Last Take
86, 122-129.

[9]     Plaintiff might have copyright problems of his own if
his view of infringement were the law.  "Joe" in plaintiff's play
tells Marilyn that she is "too fat" to wear a dress.  In one of
plaintiff's cited sources, Marilyn is told that she is "[t]oo fat
for it at the moment!"  Spoto, Marilyn Monroe 236; see also id.
at 263 (describing Monroe's frequent conversations about her
undergarments, an element plaintiff states defendant copied).  In
addition, under plaintiff's view, his use of Prince as the
musical backdrop for his play could be problematic because one
could argue that plaintiff infringed references to the play

use of the term is rather disturbing and highlights her struggles for acceptance.  In contrast, young Aretha's calls for "daddy" are not so much disturbing as understandable for a little girl calling out to her biological father.  Likewise, plaintiff's claim that defendant infringed his use of the phrase "look at that ass" fails, as does his claim that calling Monroe a "dream" is an infringing use of his original expression.  <u>See</u> Spoto, <u>Marilyn Monroe</u> 35, 68-69 (making reference to Monroe as a "dream girl" and Hollywood as a "sector of the so-called dream factory"); <u>id</u> at 83 (making references to Monroe's "ass").  The phrases serve different purposes in the works and have a basis in fact.

    3.   Dissimilar Expression

    Finally, many of the purported similarities between "Blonde" and plaintiff's plays are not similar at all.  For instance, plaintiff compares the end of his play featuring Prince's "When Doves Cry" to the beginning of "Blonde" in which seagulls are shown flying over Monroe.  Evoking images (aural or visual) of birds in two works hardly makes them substantially similar.[10]

_____

"Prince and the Showgirl" cited in Spoto.

    [10]   In any event, doves and seagulls are very different birds.  While the dove is of the order Columbiformes, and a common symbol of peace, love, and harmony, the seagull is a Largus Argentatus, and is often associated with aggressive

- 26 -

Plaintiff similarly claims that "Blonde" usurped his use of a tongue from the play.  No reasonable juror could ever believe that the playful tongue stuck out by the reporter in plaintiff's play is similar to the inappropriate actions by Monroe's piano teacher in "Blonde."  One is rather funny, the other disquieting. Plaintiff's list contains many such dissimilar references that do not support his infringement claim.

There is no question that the works are not substantially similar -- in total concept and feel, stylistically, or in their component expression.  Because no reasonable juror could find that the works are substantially similar, defendant's motion for summary judgment on the copyright infringement claim will be granted.

II.  LANHAM ACT, 15 U.S.C. § 1125(a)

The Lanham Act makes liable "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, symbol, or device . . . or any false designation of origin, which . . . is likely to cause confusion, or to cause mistake . . . as to the origin of his goods . . . or

_____

behavior and flocking to garbage.  <u>See, e.g.</u>, Local Wildlife Index, *available at* http://www.cnet.windsor.ns.ca/Environment/Advocates/Anim/gull.html (last visited Feb. 3, 2004).

misrepresents the nature" of his goods.  15 U.S.C. § 1125(a)(1).

The purpose of the Act is to protect persons engaged in commerce

against unfair competition and to prevent consumer confusion with

respect to a product's source.  15 U.S.C. § 1127; see also Dastar

Corp. v. Twentieth Century Fox Film Corp., 123 S. Ct. 2041, 2045

(2003).  To prevail on a Lanham Act claim, a plaintiff must prove

that he owns a protected trademark and that a consumer is likely

to be confused about the origin or source of the infringing

product.  15 U.S.C. §§ 1125, 1127.

The "threshold question in any [Lanham Act] infringement

action is whether the plaintiff has a valid mark entitled to

protection," Federation Internationale de Football Assoc. v.

Nike, Inc., 285 F. Supp. 2d 64, 68 (D.D.C. 2003) (internal

citations omitted), though the "mark" may be an unregistered, yet

distinctive, image or phrase.  See, e.g., EMI Catalogue P'Ship v.

Hill, Holiday, Connors, Cosmopulos, Inc., 228 F.3d 56, 61 (2d

Cir. 2000) (noting that the Lanham Act "protects unregistered

trademarks from infringement"); Warner Bros., Inc. v. Am. Broad.

Co., Inc., 720 F.2d 231, 246 (2d Cir. 1983).  Under the Act, a

protected trademark includes "any word, name, symbol, or device,

or any combination thereof . . . used by a person . . . to

identify and distinguish his or her goods, including a unique

product, from those manufactured or sold by others and to

indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  Crucial to the purpose of the Lanham Act, therefore, is a mark's "source-distinguishing ability, . . . that is, to ensure that a product's maker reaps the rewards of the reputation it has built and to enable consumers to recognize and repurchase goods with which they have been previously satisfied."  EMI Catalogue, 228 F.3d at 62.

Although titles of books, plays, films, and songs, id. at 63, distinctive elements of a television series, Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76, 78 (2d Cir. 1981), and distinctive comic book characters, Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 277 F.3d 253, 259-260 (2d Cir. 2002), have qualified as marks entitled to protection under section 1127 of the Lanham Act, the scope of section 1127 does not extend to the corpus of the book, play, film, song, television show, or comic book.  EMI Catalogue, 228 F.3d at 63 (declining to recognize Lanham Act protection for an entire song -- in contrast to a song's title or riff -- because it "would be tantamount to saying that the product itself . . . can serve as its own trademark").  An author may invoke copyright law to protect original expression in an entire work, not the Lanham Act:  the "fundamental difference[] between copyright law and trademark law" rests on what may qualify as a mark.  Sony Corp.

- 29 -

of Am. v. Universal City Studios, Inc., 464 U.S. 417, 439 n. 19

(1984).  Put simply, in the context of a literary work, the

Lanham Act protects the distinctive source-distinguishing mark,

not the work as a whole.

In addition to a protected mark, the Lanham Act requires a

plaintiff to show a "likelihood that an appreciable number of

ordinarily prudent purchasers are likely to be misled, or indeed

simply confused, as to the source of the goods in question."

Id., 228 F.3d at 61-62 (quoting Mushroom Makers, Inc. v. R.G.

Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978).  The likelihood of

consumer confusion is gauged against eight factors set forth in

Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 492, 495 (2d

Cir. 1961) (cited with approval in Basile, S.p.A. v. Basile, 899

F.2d 35, 37 (D.C. Cir. 1990); Federation Internationale, 285 F.

Supp. 2d at 72)).  Under Polaroid Corp., consumer confusion is

measured by assessing "(1) the strength of the plaintiff's mark;

(2) the degree of similarity between the plaintiff's and

defendant's marks; (3) the proximity of the products being sold;

(4) the likelihood that the plaintiff will 'bridge the gap'

between the products being sold; (5) evidence of actual

confusion; (6) defendant's good faith in using the mark; (7) the

quality of defendant's products; and (8) the sophistication of

the relevant consumer market."  Federation Internationale, 285 F.

Supp. 2d at 72.  If consumers are not confused or misled by the two marks at issue, a plaintiff cannot maintain a Lanham Act claim.

Here, plaintiff simply states with respect to the Lanham Act claim that defendant "owe[s] a duty to compensate the plaintiff from lifting his materials to create [its] works" and incorporates the copyright infringement allegations in his claim for relief.  (Am. Compl. at ¶ 47.)  Defendant rehashes the arguments proffered for his copyright infringement claim in his complaint and does not state what mark, if any, qualifies for protection under the Lanham Act.  He does not address the Lanham Act claim in his opposition to defendant's motion for summary judgment either and offers no argument that he is entitled to the protection of the Lanham Act.  Liberally construing the facts alleged in the complaint, plaintiff may be arguing that defendant copied his "distinctive" characterization of Monroe, plot elements, or turns of phrase, all thin arguments at best.  In any event, plaintiff has failed to show that such expressions are source identifying or related to goodwill that he may have developed for his play or his authorship.  See Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 169, 162 (1995) (requiring a mark to convey meaning to a consumer about origin).  The gravamen of plaintiff's complaint is one based in copyright and recognizing

plaintiff's ostensible "marks" under the Lanham Act would be "an unwarranted extension [by the Lanham Act] into an area already protected by copyright law." EMI Catalogue, 228 F.3d at 64.

Even assuming that plaintiff could overcome the hurdle of showing that he has a valid mark within the meaning of section 1127, plaintiff's claim fails under an assessment of the factors in Polaroid. Plaintiff's mark, if any, is weak. The degree of similarity between the plaintiff's and defendant's marks is minimal. "[T]he absence of substantial similarity leaves little basis for asserting a likelihood of confusion or palming off for purposes of a claim under . . . the Lanham Act." Warner Bros., 720 F.2d at 246. In addition, there is no indication that the products are being sold, if at all, in similar markets. Plaintiff has neither alleged nor shown any likelihood that he will bridge the gap between the products being sold. Nor has he offered evidence, such as a consumer survey, which shows actual confusion among consumers about the origin of "Blonde" or his works. The last three Polaroid factors offer little, if anything, to maintain the Lanham Act claim as well. As no reasonable juror could find that the works are substantially similar or lead to consumer confusion, plaintiff's allegations cannot sustain the unfair competition claim. The works -- and any ostensible marks -- are too fundamentally

different.   See id. at 247.   Accordingly, defendant's motion for summary judgment on the Lanham Act claim will be granted.

<u>CONCLUSION</u>

There is no substantial similarity in total concept and feel between "Blonde" and "Marilyn Dances:  Happy Birthday Mr. President" or "My Aretha."  Plaintiff's plays and the defendant's work are patently dissimilar in both total concept and feel and in the dissected portions that plaintiff points out as similar. Plaintiff's claim relies on generalized and abstract writing styles, unprotectable facts, and allegations of similarity that are not borne out by the works.  Not one of plaintiff's proffered reasons supports his infringement action.  Since plaintiff has not raised any issues of material fact on the copyright claim, defendant's motion for summary judgment on the copyright claim will be granted.  Because the works are not similar, and plaintiff cannot show that consumers are likely to be confused by the origin or character of "Blonde" for the purposes of his Lanham Act claim, defendant's motion for summary judgment will be granted on plaintiff's unfair competition claim as well.  A separate Order accompanies this Memorandum Opinion.

- 33 -

SIGNED this 11th day of February, 2004.

_____
RICHARD W. ROBERTS
United States District Judge